# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RANDY KOSINSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2018-0540-KSJM |
| | ) | |
| GGP INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 5, 2019
Date Decided: August 28, 2019

Seth D. Rigrodsky, Brian D. Long, Gina M. Serra, RIGRODSKY & LONG, P.A., Wilmington, Delaware; Carl L. Stine, Adam J. Blander, WOLF POPPER LLP, New York, New York; *Counsel for Plaintiff Randy Kosinski*.

Kevin G. Abrams, John M. Seaman, Matthew L. Miller, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John A. Neuwirth, Evert J. Christensen, Jr., Seth Goodchild, Matthew S. Connors, WEIL, GOTSHAL & MANGES LLP; *Counsel for Defendant GGP Inc.*

**McCORMICK, V.C.**

In 2018, GGP Inc. merged with its thirty-four percent stockholder. The plaintiff in this action owned GGP stock and sought books and records under Section 220 of the Delaware General Corporation Law to investigate possible wrongdoing in connection with the merger. After GGP rejected the inspection demand, the plaintiff commenced this action to enforce his inspection rights. In this action, GGP argues that the plaintiff is not entitled to inspect books and records because his stated purposes for inspection are not his own, he lacks a credible basis for investigating possible wrongdoing, and he otherwise fails to provide a proper purpose for requesting books and records. This post-trial decision finds in the plaintiff's favor on each of these issues. This decision does not address the scope of inspection or whether the documents sought should be subject to confidentiality restrictions—the parties have twenty days to confer concerning these issues.

## I.    FACTUAL BACKGROUND

These are the Court's findings of fact based on the paper record presented at trial. That record comprises sixty-one joint trial exhibits,[1] stipulations of fact in the pre-trial order, and the deposition testimony of the plaintiff.[2]

---

[1] This number excludes briefs and the deposition transcript included in the joint exhibits.

[2] This decision cites to docket entries by docket ("Dkt.") number, the parties' pre-trial order (Dkt. 31) ("PTO"), trial exhibits (by "JX" number), and the Transcript of the March 20, 2019 Deposition of Randall Kosinski (JX 61) ("Kosinski Dep. Tr.").

## A.    The Merger

GGP was a publicly traded real estate company incorporated in Delaware and headquartered in Chicago, Illinois.[3]  In 2010, GGP emerged from bankruptcy and entered into a series of investment agreements, including one with Brookfield Property Partners L.P. (together with its subsidiaries and affiliates, "Brookfield"), a commercial real estate company.[4]  Brookfield owned about thirty-four percent of the outstanding shares of GGP's common stock.[5]

On November 11, 2017, Brookfield submitted an offer to acquire all of the outstanding shares of GGP common stock it did not already own.[6]  Brookfield offered to pay per share either 0.9656 units of Brookfield or $23.00, subject to proration.[7]

The next day, the GGP board formed a special committee (the "Special Committee") to negotiate the merger.[8]  At the time of the merger, the GGP board comprised Chief Executive Officer Sandeep Mathrani, Richard B. Clark, Mary Lou Fiala, J. Bruce Flatt, Janice R. Fukakusa, John K. Haley, Daniel B. Hurwitz, Brian

---

[3] PTO ¶ 14.

[4] *See generally* JX 2 (memorializing the 2010 investment agreement between Brookfield and GGP).

[5] PTO ¶ 15.

[6] *Id.* ¶ 19.

[7] JX 41 at 2.

[8] PTO ¶ 20.

W. Kingston, and Christina M. Lofgren.[9]  Of the nine directors, three—Clark, Flatt, and Kingston—were affiliated with Brookfield and appointed by Brookfield to the GGP board pursuant to the Brookfield-GGP investment agreements.[10]  The Special Committee comprised Fiala, Fukakusa, Haley, Hurwitz, and Lofgren.[11]  Hurwitz was made the Special Committee chair.[12]

The Special Committee negotiated with Brookfield throughout late 2017 and into early 2018, and entered into a merger agreement on March 26, 2018 (the "Merger Agreement").[13]  Pursuant to the Merger Agreement, GGP stockholders were entitled to total per share consideration of $23.50 in cash, one Brookfield unit, or one share of a newly created U.S. Real Estate Investment Trust ("REIT"), subject to proration.[14]  The Special Committee's negotiation efforts resulted in a 50 cent per share increase.[15]  Those efforts also increased the exchange ratio from 0.9656 to 1.0000.[16]

---

[9] *Id.* ¶ 16.

[10] *Id.* ¶ 17.

[11] *Id.* ¶ 18.

[12] *Id.*

[13] *Id.* ¶ 22.

[14] JX 29 at 1.

[15] *Id*.

[16] *Id*.

3

The Special Committee unanimously recommended the transaction.[17] On July 26, 2018, GGP stockholders voted to approve the merger.[18] The merger closed on August 28, 2018.[19]

## B. The Demand for Inspection

Plaintiff Randy Kosinski ("Plaintiff") is the quintessential main street investor. He lives in the suburbs of Buffalo, New York.[20] In his early twenties, he built a hockey rink, which he ran for around thirty-four years.[21] In retirement, Plaintiff has grown more interested in his stock portfolio.[22] In his words: "I'm not a rich guy. I make a living. I've worked for my living. Again, I've invested for my living, I babysit my living, I make sure what my stocks are doing, I do my homework."[23]

Plaintiff did his homework on GGP. Since 2009, Plaintiff has accumulated 12,000 shares of GGP.[24] Plaintiff explained that he regularly reviewed GGP

---

[17] *Id.*

[18] PTO ¶ 23.

[19] *Id.* ¶ 24.

[20] JX 31 at 1.

[21] *Id.* at 46:4–7 ("[A]bout 21 years old, I borrowed a couple dollars from my mom and my dad and I built a hockey rink. And I did that for about 33, 34 years.").

[22] *See id.* at 106:3–108:20.

[23] *Id.* at 117:14–18.

[24] PTO ¶ 13; Kosinski Dep. Tr. at 100:19–23 (explaining that Kosinski first became a GGP stockholder in 2009).

statements,[25] read analyst reports,[26] and followed the retail sector.[27] When the merger was announced, Plaintiff had an informed view on the market and believed that "[GGP] was making all the right moves" and that GGP's "value was much greater" than the deal price.[28]

Plaintiff was disappointed with the merger price.[29] His kneejerk reaction was to pursue a lawsuit challenging the merger.[30] The day after the merger was announced, Plaintiff responded to an advertisement from a law firm about a potential lawsuit challenging the merger.[31] The next day, Plaintiff called GGP's Investor Relations department and left the following voicemail:

> Kevin, I'm a shareholder. I'm wondering if you're the investor relation guy or not, but I just needed to voice my opinion. I've been a long-term shareholder and this is a disgusting back-door deal that you guys just put together.

---

[25] Kosinski Dep. Tr. at 14:14–17 ("I've been thoroughly involved with GGP in looking at . . . their statements and so on and for a number of years.").

[26] *Id.* at 10:16–18 ("I'm a long-time [GGP] shareholder, and I keep myself fairly involved in all the reports on them . . . .").

[27] *Id.* at 40:22–24 (mentioning having read numerous "reports" on the retail market generally).

[28] *Id.* at 117:21–118:8; *see also id.* at 38:13–39:2 (explaining that Kosinski believed GGP to be worth between $28 and $34 per share after "listening to analysts" and in relying on his "knowledge of watching the company enough and the retail sector and the weakness in the retail sector").

[29] *Id.* at 11:6–11, 14:7–11 (stating that Brookfield's original offer of $23 per share of GGP was "unfair" and that the subsequent 50 cent increase was "fairly a joke").

[30] *Id.* at 10:9–25, 12:14–22.

[31] *Id.* at 10:9–25.

5

I mean, this is full of fraud and I'm very disappointed. Hopefully, we'll win our case. Thank you.[32]

Plaintiff subsequently learned of his information rights as a GGP stockholder.[33] He came to believe that obtaining information was the logical first step. As he said, "I felt that [counsel] had the right approach about obtaining books and records and not to put the cart before the horse . . . ."[34]

Around July 9, 2018, through counsel, Plaintiff demanded inspection of GGP's books and records pursuant to Section 220.[35] Plaintiff testified that he relied on counsel to prepare the demand letter, but that he reviewed it before it was sent and concluded it accurately reflected his purposes.[36] During his deposition, Plaintiff explained each purpose in detail.[37]

### C. This Litigation

GGP rejected Plaintiff's demand on July 17, 2018.[38] On July 25, 2018, Plaintiff filed his Verified Complaint Pursuant to 8 *Del. C.* § 220 to Compel Inspection of Books and Records. GGP answered the complaint and the parties

---

[32] *Id.* at 22:21–23:4.

[33] *Id.* at 26:20–27:4.

[34] *Id.* at 26:21–23; *see also id.* at 15:17–19. (stating his belief that "[y]ou have to grind your way to the top and get the books and records and see if there was any wrongdoing").

[35] *See generally* JX 41.

[36] Kosinski Dep. Tr. at 35:18–37:13.

[37] *See generally id.* at 37:14–92:19.

[38] JX 43.

stipulated to a trial date. GGP deposed Plaintiff on March 20, 2019, and his deposition testimony was admitted as evidence at trial.[39] The parties completed briefing on May 14, 2019,[40] and the Court held trial on June 5, 2019.

Other stockholders filed plenary class action litigation in this Court[41] and in federal court.[42] Plaintiff moved to intervene in the action pending before this Court on March 6, 2019.[43] Counsel to the class stipulated to permit intervention for limited purposes and to stay the plenary litigation pending resolution of the instant action.[44]

---

[39] JX 61.

[40] *See* Dkt. 19, Def.'s Opening Pre-Trial Br. ("Def.'s Opening Br."); Dkt. 20, Pl.'s Opening Pre-Trial Br. ("Pl.'s Opening Br."); Dkt. 25, Pl.'s Answering Pre-Trial Br. ("Pl.'s Ans. Br."); Dkt. 26, Def.'s Answering Pre-Trial Br. ("Def.'s Ans. Br."). The parties waived post-trial briefing. *See* Dkt. 30, PTO ¶ 40.

[41] In early April 2018, two GGP stockholders, represented by different counsel, commenced two different putative class actions in this Court challenging the merger. *See Susman v. Clark*, C.A. No. 2018-0267-JRS (Compl. filed April 10, 2018); *Lowinger v. Mathrani*, C.A. No. 2018-0272-JRS (Compl. filed April 11, 2018). On April 19, 2018, Vice Chancellor Slights consolidated these two actions under the caption *In re GGP Inc. Stockholder Litigation*. *See* C.A. No. 2018-0267-JRS, Dkt. 7. On May 10, 2018, the plaintiffs in the consolidated action filed a consolidated amended complaint and moved to preliminarily enjoin the merger based on alleged disclosure deficiencies. *See* C.A. No. 2018-0267-JRS, Dkt. 20, 21, 22. On June 11, 2018, GGP issued supplemental disclosures to its merger proxy materials, and the plaintiffs withdrew their motion for a preliminary injunction. *See* C.A. No. 2018-0267-JRS, Dkt. 50.

[42] On May 3, 2018, a third GGP stockholder filed a complaint challenging the transaction in the United States District Court for the District of Delaware. *See Blonstein v. GGP, Inc.*, No. 1:18-cv-00679-CFC (D. Del.).

[43] *See* C.A. No. 2018-0267-JRS, Dkt. 77.

[44] *See* C.A. No. 2018-0267-JRS, Dkt. 90, 93.

7

## II.   LEGAL ANALYSIS

Under Section 220, a stockholder is entitled to inspect a company's books and records if he demonstrates by a preponderance of the evidence that he: "(1) is a stockholder of the company, (2) has made a written demand on the company, and (3) has a proper purpose for making the demand."[45]  If a stockholder meets these three requirements, he must then establish "that each category of the books and records requested is essential and sufficient to [his] stated purpose."[46]

Defendant challenges Plaintiff's Section 220 demand on three grounds.  First, Defendant argues that Plaintiff's purposes in making the demand were his lawyers' rather than his own.  Second, Defendant argues that Plaintiff's stated purposes are improper.  Third, Defendant argues that the categories of documents Plaintiff seeks are not necessary and essential to his enumerated purposes.

### A.   Plaintiff's Purposes Are His Own.

Defendant argues that Plaintiff's demand and this litigation are lawyer-driven and reflect the intentions of Plaintiff's counsel rather than Plaintiff himself.[47]

---

[45] *Paul v. China MediaExpress Hldgs., Inc.*, 2012 WL 28818, at *3 (Del. Ch. Jan. 5, 2012); 8 *Del. C.* § 220(c); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016) (to obtain books and records, the plaintiff must demonstrate the three elements of Section 220 "by a preponderance of the evidence").

[46] *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996) (citing *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 167 (Del. Ch. 1987)).

[47] *See* Def.'s Opening Br. at 19–23.

8

It is true that "[a] corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand."[48] However, "[s]uch a showing is fact intensive and difficult to establish."[49] In *Wilkinson v. A. Schulman, Inc.*, this Court declined to enforce inspection rights because "the purposes for the inspection belonged to [the plaintiff's] counsel . . . and not to [the plaintiff] himself."[50] Several unusual facts led the Court to conclude that the plaintiff in *Wilkinson* merely "lent his name" to counsel for purposes of counsel's own Section 220 investigation.[51] In that case, the plaintiff admitted in his deposition testimony that the purposes in his demand letter were not his own and that his counsel came up with each of them.[52] Discovery revealed that the issue that concerned the plaintiff (the company's negative financial results) "differed substantially" from what his counsel ultimately chose to investigate (an executive compensation issue).[53] Also, the plaintiff lacked any understanding of his demand letter or involvement in the action to enforce his inspection rights.[54]

---

[48] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007) (citing *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156 (Del. Ch. 2006)).

[49] *Id.*

[50] 2017 WL 5289553, at *2 (Del. Ch. Nov. 13, 2017).

[51] *Id.* at *2.

[52] *Id.*

[53] *Id.* at *3.

[54] *Id.* at *2–3.

In this case, Defendant emphasizes the fact that Plaintiff's original intention in retaining counsel was to commence litigation challenging the merger, rather than to seek to inspect books and records.[55] Defendant contends that Plaintiff's counsel, having failed to file suit before three other GGP stockholders did in April and May 2018, "lost the race to the courthouse" and decided to go the Section 220 route instead.[56] This, Defendant argues, qualifies as the sort of "lawyer-driven litigation" that *Wilkinson* wards against.[57] Defendant also points to a text-message in which Plaintiff references his books and records demand and states that he had made a lot of money on his GGP stock, "so whatever happens . . . happens."[58] In Defendant's view, this message shows that Plaintiff is taking a backseat to this litigation and is merely "lending his name" to the complaint,[59] as the plaintiff did in *Wilkinson*.

Defendant's efforts to analogize this case to the unusual facts of *Wilkinson* are deeply misguided. In relying on *Wilkinson*, Defendant ignores the extensive evidence of record, which reflects that Plaintiff's stated purposes were his own and that Plaintiff has been meaningfully involved in seeking books and records.

---

[55] Def.'s Opening Br. at 20–21.

[56] *Id*. at 21.

[57] *Id.* at 22.

[58] *Id.*; JX 40.

[59] Def.'s Opening Br. at 21–22.

Plaintiff's deposition testimony revealed him to be sincere in his pursuit of books and records, unlike the plaintiff in *Wilkinson*. In his deposition, Plaintiff admitted that his counsel helped articulate his demand purposes,[60] but demonstrated a clear understanding of the facts and goals relevant to each purpose. For example, when asked which of the categories of requested documents would help him achieve the purpose of valuing his shares, Plaintiff explained that the requested documents would help determine how the Special Committee "came up with their share price . . . versus what the fair market value maybe could have been."[61] He further stated that he sought information about "how [the Special Committee] arrived at this share price or why the deal was necessary or why the deal was even entertained in the first place."[62]

Also in his deposition, Plaintiff emphasized the importance of investigating the disinterestedness of the Special Committee, stating, "this should have been a totally independent group with no ties whatsoever. And I think . . . maybe the special committee was [rushing] to get this to go through."[63] He specifically identified that there was at least one Special Committee member who had ties to one of the merger's financiers, Royal Bank of Canada ("RBC"), and that another Special Committee

---

[60] Kosinski Dep. Tr. at 36:21–37:13.

[61] *Id*. at 79:22–80:3.

[62] *Id*. at 82:10–15.

[63] *Id*. at 84:10–17.

member held overlapping employment terms with Brookfield executives at Ernst & Young.[64] Further, Plaintiff was able to define "fiduciary duty" with relative accuracy,[65] and intentionally left the legal question of whether breach may have occurred to his attorneys.[66] Plaintiff's deposition revealed him to be motivated to inspect GGP's documents, apprised of the contents of the demand and the circumstances of the merger, and chalk-full of common sense. The fact that Plaintiff sought and accepted the advice of counsel is to his credit, not his detriment.[67]

Further, Plaintiff has been meaningfully involved the demand process and this litigation, unlike the plaintiff in *Wilkinson*.[68] The text-message to which Defendant points is not persuasive evidence that Plaintiff "merely lent his name to the effort."[69] In his deposition testimony, Plaintiff explained: "Well, it's unchartered waters to me, so whatever is going to happen is going to happen. I can't control what I can't

---

[64] *Id.* at 51:16–52:7.

[65] *Id.* at 69:25–70:5.

[66] *Id.* at 71:12–23.

[67] *See generally Wilkinson*, 2017 WL 5289553, at *3 (observing that "[a] stockholder obviously can use counsel to seek books and records. Section 220 expressly contemplates that a stockholder can make a demand 'in person or by an attorney.' Indeed, given the complexity of Delaware's sprawling Section 220 jurisprudence, a stockholder is well-advised to secure counsel's assistance"); *Inter-Local Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *10 (Del. Ch. Jan. 25, 2019) (holding that stockholders are entitled to rely on counsel "to raise concerns, to advise them on how to remedy those concerns, and to pursue appropriate remedies").

[68] *Id.* at 125:2–10, 125:20–22, 139:22–24.

[69] Def.'s Opening Br. at 22.

control."[70] The Court does not interpret Plaintiff's text-message as an indication that he took a backseat in this litigation, but rather as an acknowledgement of uncertainty inherent in any adversarial process.

## B. Plaintiff's Purposes Are Proper.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection."[71] A purpose is "proper" where it reasonably relates to the stockholder's interest as a stockholder.[72] "In a section 220 action, a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence."[73]

Plaintiff articulated three purposes in his Section 220 demand: (1) "to investigate potential breaches of fiduciary duty in connection with the merger,"

---

[70] Kosinski Dep. Tr. at 115:8–12.

[71] *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982) (citing 8 *Del. C.* § 220(b); *Gen. Time Corp. v. Talley Indus.*, 240 A.2d 755 (Del. 1968); *Skoglund v. Ormand Indus.*, 372 A.2d 204, 207 (Del. Ch. 1976)).

[72] 8 *Del. C.* § 220(b).

[73] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006); *accord Thomas & Betts*, 681 A.2d at 1031 ("When a stockholder seeks inspection of books and records, the burden of proof is on the stockholder to demonstrate that his purpose is proper." (citing *CM & M Gp.*, 453 A.2d at 792)).

(2) "to investigate director disinterestedness related to the merger," and (3) "to value [Plaintiff's] GGP shares."[74]

## 1.    Investigating Possible Wrongdoing

To inspect books and records for the purpose of investigating waste, mismanagement, or wrongdoing, a stockholder must "present some evidence that establishe[s] a credible basis from which the Court of Chancery could infer there were legitimate issues of possible waste, mismanagement or wrongdoing that warrant[s] further investigation."[75]  The "credible basis" standard is "the lowest possible burden of proof."[76]  It requires that the plaintiff demonstrate only "some evidence" of *possible* mismanagement or wrongdoing to warrant further investigation.[77]  "A stockholder is 'not required to prove by a preponderance of the

---

[74] Dkt. 1, Verified Compl. Ex. 1, Demand for Inspection of Books and Records of GGP Inc. Pursuant to 8 Del. C. § 220 at 6–7.  *See also* Dkt. 37, Trial Tr. at 17:12–17 (Plaintiff's Counsel).  Defendant contends that Plaintiff waived his right to pursue the second and third purposes by failing to present argument on these purposes in his opening pre-trial brief. Def.'s Ans. Br. at 8 (citing *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999)). Although Plaintiff's briefing on this issue is less than clear, this Court finds that Plaintiff has not waived his arguments with respect to the first and second purposes. *See generally* Pl.'s Opening Br. at 26–27 ("The plaintiff has presented considerable evidence . . . demonstrating that the merger consideration was grossly inadequate and a paltry improvement from Brookfield's initial offer."); *id.* at 25 ("There is a credible basis to infer that the Special Committee may have lacked independence from Brookfield.").

[75] *Seinfeld*, 909 A.2d at 118.

[76] *Id.* at 123.

[77] *Id.* at 122 (quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 568 (Del. 1997)); *see In re Facebook, Inc. Section 220 Litig.*, 2019 WL 2320842, at *13 (Del. Ch. May 31, 2019) ("The 'credible basis' standard is the lowest burden of proof known in

14

evidence that waste and [mis]management are actually occurring.'"[78] The "threshold may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[79]

To meet the credible basis requirement, Plaintiff argues that Brookfield was GGP's *de facto* controller at the time of the merger, and that the procedural protections sufficient to trigger the business judgment standard of review under *Kahn v. M & F Worldwide Corp.*[80] were not implemented.

Defendant first responds by denying that Brookfield was a *de facto* controller, but Defendant's argument is unpersuasive. Prior to the merger, Brookfield owned approximately thirty-four percent of GGP's common stock.[81] Brookfield's stock ownership gave it the power to appoint three directors to GGP's nine-member board.[82] In its 2017 Form 10-K, GGP indicated that Brookfield owned or managed "a significant portion of the shares of [GGP] common stock" and expressed that this "concentration of ownership . . . may make some transactions more difficult or

---

our law; it requires merely that the plaintiff put forward 'some evidence' of wrongdoing." (quoting *Seinfeld*, 909 A.2d at 118, 123)).

[78] *Seinfeld*, 909 A.2d at 123 (alteration in original) (quoting *Thomas & Betts*, 681 A.2d at 1031).

[79] *Id.* (quoting *Sec. First*, 687 A.2d at 568).

[80] 88 A.3d 635 (Del. 2014) [hereinafter *MFW*].

[81] PTO ¶ 15.

[82] JX 23 at 11.

impossible without their support, or more likely with their support."[83]  The 10-K

further states that Brookfield would be able to exert "significant influence" over

GGP in making "any determinations with respect to mergers."[84]  In the Section 220

context, these facts are enough to demonstrate the possibility that Brookfield was a

*de facto* controller at the time of the merger.[85]

Defendant next contends that whether Brookfield and GGP implemented the

procedural protections of *MFW* speaks solely to whether the entire fairness standard

applies in plenary litigation and not to whether the Special Committee committed

possible wrongdoing to support a Section 220 inspection.  As Defendant correctly

observes, it is "*never* a requirement" that a merger transaction be subject to the

protections of *MFW*,[86] and the absence of those protections does not mandate a

finding of wrongdoing.  Rather, satisfying the *MFW* requirements merely subjects

the transaction to a more deferential standard of review.

---

[83] *Id.*

[84] *Id.*

[85] Defendant relies on this Court's decision in *In re Rouse Properties, Inc.* to argue that Brookfield was not a *de facto* controller of GGP.  Def.'s Ans. Br. at 11.  In *Rouse*, the court found that Brookfield was not the controller of another target company in which it owned a 35.5 percent stake.  2018 WL 1226015, at *18 (Del. Ch. Mar. 9, 2018).  But *Rouse* was a plenary litigation involving breach of fiduciary duty claims, whereas this case involves a mere Section 220 demand with a significantly lower burden.  *Id.* at *1.  Further, in this case, Brookfield holds contractual rights to appoint directors and unilaterally replace the board, which in *Rouse* Brookfield did not hold.  *Id.* at *18; JX 23 at 11.

[86] Def.'s Opening Br. at 31 (emphasis in original).

Yet, the reason why the presence of certain procedural protections results in a deferential standard under *MFW* is that, in theory, those protections "operate[] to replicate an arm's length merger."[87]  In *MFW*, the Delaware Supreme Court described the relevant procedural protections as "optimal[]" to protect minority stockholders from the "undermining influence" of a controller.[88]  It logically follows that where the procedural protections that trigger deferential review of a controller transaction under *MFW* are absent, it is *possible* that the transaction was not at arm's length, less than optimal, and potentially tainted by the undermining influence of a controller.  There is no reason why these possibilities cannot contribute to a credible basis.[89]

In this case, the three grounds Plaintiff identifies for calling into question compliance with *MFW* establish a credible basis to investigate possible wrongdoing.

*First*, Plaintiff points to facts to show that members of the Special Committee were interested or lacked independence.[90]  Fukakusa served as Chief Administrative Officer and Chief Financial Officer of RBC for some time, until her retirement in

---

[87] *MFW*, 88 A.3d at 639.

[88] *Id.* at 644.

[89] This is an exceptionally modest point.  To emphasize, this decision does not espouse a blanket rule that pointing to the absence of *MFW* procedural protections automatically supplies a credible basis for possible wrongdoing.  This decision merely concludes that the absence of *MFW* procedural protections might contribute to a credible basis.

[90] Pl.'s Opening Br. at 25–26.

17

2017.[91]  In 2016 alone, her direct compensation totaled almost $4.65 million—almost 60 percent of that amount came in the form of performance deferred share units ("PDSUs") and stock options, as part of RBC's mid and long-term incentive plan.[92]  RBC disclosed that, "[i]n light of her decision to retire early in 2017, Ms. Fukakusa elected to receive her equity award in the form of PDSUs."[93]  After she retired from her position at RBC, Ms. Fukakusa was appointed to the Special Committee,[94] and the merger was a transaction from which RBC, as one of its financiers, stood to receive a substantial benefit.[95]  Haley's employment at Ernst & Young, which overlapped with that of two Brookfield executives, is evidence of another possible conflict.[96]

*Second*, Plaintiff alleges that Brookfield's initial offer was not conditioned on the approval of a special committee.[97]  *MFW* requires a "controller to self-disable *before* the start of substantive economic negotiations" to prevent the controller from

---

[91] JX 9 at 69.

[92] *Id.*

[93] *Id.*

[94] PTO at ¶ 18.

[95] JX 38 at 129.

[96] *Id.* at 244 (indicating that Haley was employed by Ernst & Young from 1998 to 2009); JX 51 (indicating that Lori Pearson, COO of Brookfield Asset Management, was employed by Ernst & Young from an unknown time to August 2003); JX 52 (indicating that Sachin Shah, CEO of Brookfield Renewable Partners, was employed by Ernst & Young from an unknown time until August 2002).

[97] Pl.'s Opening Br. at 24.

using procedural protections as bargaining points in price negotiations.[98] Where a controller fails to condition the transaction on procedural protections, there is a risk that achieving those protections negatively affected price negotiations.

*Third*, Plaintiff points to facts suggesting that the Special Committee failed to obtain a fair price in negotiations with Brookfield. To support this contention, Plaintiff points to the following financial advisor presentations and analyst reports:

- In late November and early December 2017 presentations, the Special Committee's financial advisor, Goldman Sachs ("Goldman"), calculated GGP's NAV as ranging from $26.65 to $29.93 per share,[99] and Brookfield's initial offer as having an actual value of only $22.06.[100] Goldman's presentations also provided a selection of market commentary from equity analysts claiming the offer price was too low.[101]

- On the same date the Merger Agreement was announced, James Sullivan, an equity analyst at BTIG, LLC, determined that the actual consideration offered under the terms of the Merger Agreement was worth only $21.90 per share in light of the then-equity prices of the Brookfield units and shares of the newly created U.S. REIT, as well as the Merger Agreement's agreed upon cash/equity ratio of 61 percent cash and 39 percent equity.[102] Sullivan's calculation was higher than Goldman's own $21.79 blended offer price calculation, as provided in its final financial presentation to the Special Committee of March 26, 2018.[103]

---

[98] *Flood v. Syntura Int'l, Inc.*, 195 A.3d 754, 763 (Del. 2018).

[99] JX 20 at 4.

[100] JX 21 at 5.

[101] *Id.* at 9.

[102] JX 27.

[103] JX 28 at 6.

- Sullivan's 12-month target price for GGP was $27.50 per share.[104] Indeed, Sullivan's NAV estimate for GGP was $32.93 per share, which compares to the consensus estimate of $28.06 per share.[105] As Sullivan stated, "[w]e are surprised the Special Committee has unanimously approved the new offer and recommends that the GGP shareholders approve the proposed terms," whereby "there is no indication that GGP needs to sell the company at the present time or requires anything that [Brookfield] can provide it with . . . ."[106]

- On March 27, 2018, J.P. Morgan disseminated an equity research report valuing GGP's NAV at approximately $28 per share.[107] The report provided that, based upon discussions with investors, "the range of potential prices that had commonly been expected (in [J.P. Morgan's] view) was $25 - $27.50 . . . hence, $23.50 is considerably shy of that level."[108]

- On March 28, 2018, Julian Lin reported on *Seeking Alpha* that the consideration offered pursuant to the Merger "materially undervalues the underlying prime real estate" GGP owns.[109] Lin described the Merger as "very disappointing."[110]

- The cash price of $23.50 per share is lower than GGP's 52-week high of $27.10 per share (the blended value providing a negative 19.6 percent premium, as calculated by Goldman in its financial presentation to the Special Committee dated March 26, 2018), the median street price target of $24.00 per share, the mean price target of $24.65 per share, and the high street price target of $34.50 per share.[111]

---

[104] JX 27 at 1.

[105] *Id.*

[106] *Id.*

[107] JX 30 at 1.

[108] *Id.*

[109] JX 34 at 1.

[110] *Id.* at 2.

[111] JX 28 at 6, 48.

- Goldman's analysis of the blended value demonstrated that the merger price provided a negative 5.8 percent premium to GGP's 1-year volume weighted average price, a negative 15.8 percent premium to GGP's 3-year VWAP, a negative 20.3 percent premium to Brookfield's own fourth quarter NAV of GGP, and a negative 16.2 percent premium to SNL Financial's consensus NAV.[112]

Taken together, this evidence supplies a credible basis to infer the possibility of wrongdoing. To be clear, this decision need not opine as to whether Plaintiff's allegations would meet the burden for pleading a claim for breach of fiduciary duty. But Plaintiff's showing is sufficient to meet the exceptionally low standard to support a credible basis for investigating wrongdoing.

### 2. Investigating Director Disinterestedness Related to the Merger

Another proper Section 220 purpose is "to investigate questions of director disinterestedness and independence."[113] "Because director independence is a 'contextual inquiry,' potential [stockholder] plaintiffs have been admonished to employ the Section 220 process to delve into the relationship among board members . . . ."[114] For example, the Delaware Supreme Court has observed that a stockholder might use a Section 220 demand to uncover "cronyism" in the process of nominating directors, or to make sure the nomination process "incorporated

---

[112] *Id.* at 6.

[113] *Yahoo!*, 132 A.3d at 784.

[114] *Amalgamated Bank v. UICI*, 2005 WL 1377432, at *3 (Del. Ch. June 2, 2005).

21

procedural safeguards to ensure directors' independence."[115]  It is certainly "'within [a stockholder's] power to explore these matters' using Section 220."[116]

In this case, Plaintiff's allegations concerning Fukakusa and Haley satisfy Section 220's minimal standard for investigating Fukakusa's and Haley's disinterestedness and independence.[117]

### 3.    Valuing Plaintiff's GGP Shares

"[V]aluation of one's shares is a proper purpose for the inspection of corporate books and records."[118]  Defendant argues that the only reason Plaintiff might need to value his shares is to allege that the merger price was unfair in plenary litigation. Further, if Plaintiff ever files plenary litigation, "he may seek documents concerning

---

[115] *Beam*, 845 A.2d at 1056.

[116] *Yahoo!*, 132 A.3d at 785 (alteration in original) (quoting *Beam*, 845 A.2d at 1056).

[117] Plaintiff notes that director independence is a legitimate area of inquiry, separate and apart from a stockholder's investigation of potential breach of fiduciary duty claims. *See* Pl.'s Ans. Br. at 12 (citing *Yahoo!*, 132 A.3d at 784–85).  Indeed, past decisions issued by this court analyze these two purposes separately. *See, e.g.*, *Yahoo!*, 132 A.3d at 777–85 (analyzing the purpose of "Investigating Wrongdoing or Mismanagement" and the purpose of "Exploring Director Disinterestedness and Independence" separately); *Rock Solid Gelt, Ltd. v. SmartPill Corp.*, 2012 WL 4841602, at *3–4 (Del. Ch. Oct. 10, 2012) (analyzing the propriety of purposes "to investigate whether the Board committed breaches of fiduciary duties and whether the Special committee was indeed independent with regard to the [relevant transaction]" separately).  Defendant suggests that the "credible basis" standard applicable when a stockholder's purpose is to investigate possible wrongdoing also attaches to the purpose of investigating director disinterestedness. Def.'s Opening Br. at 25.  Because Plaintiff meets the credible basis standard, the Court need not resolve this issue.

[118] *Polygon Global Opportunities Master Fund v. West Corp.*, 2006 WL 2947486, at *3 (Del. Ch. Oct. 12, 2006) (citing *CM & M Grp.*, 453 A.2d at 792).

the value of GGP shares as part of Rule 34 discovery."[119]  Defendant's argument

ignores that Delaware courts instruct stockholders to pursue Section 220 as a means

of gathering information *before* making plenary claims in order to meet their

pleading burden.[120]

Defendant further argues that Plaintiff does not need to value his stock

because he already determined how much he believes his shares were worth at the

time of the merger.[121]  Defendant overstates the facts on this point.  Plaintiff's belief

concerning the value of his stock at the time of the merger does not deprive him of

his right to seek corporate records in order to make an informed conclusion.

### C.    Plaintiff Is Entitled to Books and Records That Are Necessary and Essential to His Purposes.

Having demonstrated proper purposes, Plaintiff is entitled to books and

records that are essential, but no more than are sufficient, for Plaintiff to achieve his

purposes.[122]  The Delaware Supreme Court refers to this standard as the "necessary

---

[119] Def.'s Opening Br. at 23.

[120] *See Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004) (noting that the stockholder plaintiff should have made a Section 220 demand before pursuing her claim for breach of fiduciary duty); *Lavin v. W. Corp.*, 2017 WL 6728702, at *10 n.82 (Del. Ch. Dec. 29, 2017) (explaining that, had the stockholder waited to initiate his Section 220 action until after he brought his plenary action, his complaint would have "lack[ed] the fruits of his Section 220 yield" and he would have "been deemed to have improperly employed Section 220 as a substitute for discovery").

[121] Def.'s Opening Br. at 23.

[122] *Yahoo!*, 132 A.3d at 775 (citing *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1996)).

and essential" standard.[123]  "Documents are 'necessary and essential' pursuant to a Section 220 demand if they address the 'crux of the shareholder's purpose' and if that information 'is unavailable from another source.'"[124]

## III.  CONCLUSION

This decision finds that Plaintiff's stated purposes are his own, that Plaintiff's purposes are proper, and that Plaintiff is entitled to inspect documents necessary and essential to achieve his purposes.  This decision does not address the scope of inspection or whether the documents sought should be subject to reasonable confidentiality restrictions.

Because Defendant argues that Plaintiff lacked any proper purpose, the parties have not meaningfully conferred concerning the scope of production necessary and essential to meet Plaintiff's purposes.  Nor does the record reflect any negotiations concerning whether the documents to be inspected should be subject to reasonable confidentiality restrictions—this Court does not presume that they should be.[125]

---

[123] *Saito v. McKesson HBOC, Inc.*, 806 A.2d 113, 116 (Del. 2002) (citing *Petition of B & F Towing & Salvage Co.*, 551 A.2d 45, 51 (Del. 1988)).

[124] *Wal-Mart Stores, Inc. v. Ind. Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014) (quoting *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011)).

[125] *See Tiger v. Boast Apparel, Inc.*, --- A.3d ---, 2019 WL 3683525, at *4 (Del. Aug. 7, 2019) (holding that "there is no presumption of confidentiality in Section 220 productions").

24

The parties have twenty days to confer concerning the scope of books and records that are necessary and essential to Plaintiff's proper purposes and whether those books and records should be subject to reasonable confidentiality restrictions. The parties shall notify the Court in the event they are unable to agree concerning scope and confidentiality. If the parties are unable to agree, they may contemporaneously submit supplemental briefs not to exceed 8,000 words on these issues.